This time we'll hear Herrick v. Grindr. TOR ECKLUND Good morning, Your Honors. May it please the Court, I am Tor Ecklund and I represent appellate Matthew Herrick. And Your Honor, since there are two appellees in this case, I'd like to reserve five minutes if possible for rebuttal. Thank you, Your Honor. THE COURT Could you hold on one second? May I proceed, Your Honor? THE COURT We're just waiting for the . . . any hubbub to die down. Go ahead. TOR ECKLUND Thank you, Your Honor. Grindr is a targeting system. It's not just a user interface. And one of the things I noticed as I went back to PrEP for these oral arguments is just how much of the focus in this case has just been on this user interface. Grindr is an app, not a website. And that's a crucial distinction because when you look back at all the case law that's dealt with the CDA with anything remotely like this fact pattern, and this fact pattern is unique. It's case law that deals with websites, not apps. There are no cases with this type of fact pattern. THE COURT Is this a point about whether or not Grindr qualifies as an interactive computer service? Or is it a separate point that you're making? TOR ECKLUND The point I'm making, Your Honor, is we're up here asking for a remand because we don't think that the answers to those questions like we maintain that Grindr isn't an ICS. But we don't think there's a sufficient record in this case to make that kind of determination right now, which is why we'd like to see this remanded to the district court, and which it is why it is the sensible policy of all the circuit courts in this country that . . . THE COURT What questions need further development? TOR ECKLUND We . . . THE COURT What questions need further evidentiary development on whether or not it qualifies as an entity entitled to the immunity under the Communications Decency Act? TOR ECKLUND All three prongs of that, whether it's an interactive computer service, we don't know anything about the functionality of the system, how it interfaces with the network architecture . . . THE COURT So rightly or wrongly, mistakenly or not, the allegation was that Grindr was an ICS? TOR ECKLUND The appellants maintain it's not. THE COURT But you allege that it was. TOR ECKLUND No, we didn't. We mistakenly alleged it in our complaint, but when we argued this motion to the district court, we argued it wasn't, and the district court acknowledges that argument in its order. We maintain that it's not, but that question doesn't need to be answered by this court right now, because the reason that all the courts say that the CDA is usually an affirmative defense is precisely because of these issues that we're having here. THE COURT How does it differ from an interactive dating website? TOR ECKLUND It's a targeting system, because it geolocates not only people with high levels of precision, it leaks that data, so that third parties . . . THE COURT Why does that matter in this case? Because at the time of the irrelevant events, your client was not a subscriber or a participant, and, therefore, there was no geophysical location data for your client. TOR ECKLUND And that's . . . THE COURT It was given out. TOR ECKLUND Precisely why we need to remand, because if you look at page 866 of the Joint Appendix, you will see a series of photographs, and in those photographs, you will see Mr. Herrick's geolocation, relational geolocation, as being 104 feet away from the person who was coming to see him. JUSTICE GINSBURG I want to hear more about that in a moment, but I want to take you back to, I think, what the concern of the Court is here. You alleged that the defendant was covered by the Communications Decency Act, that it was a . . . TOR ECKLUND That's not correct. We say it's . . . JUSTICE GINSBURG No, we're saying . . . JUSTICE GINSBURG It was only when you responded to the motion that you raised the question of whether they were or were not. TOR ECKLUND I'm sorry, Your Honor, when you say CDA, I think you mean one element of the CDA when you're talking about interactive computer service, and you're referring . . . JUSTICE GINSBURG You alleged that they were an interactive computer service. That's how you characterized them in your complaint. Is that correct? TOR ECKLUND At one point in our complaint, and that was a mistake. JUSTICE GINSBURG Wait a minute. You didn't move to amend the complaint, correct? TOR ECKLUND Yes, we did. JUSTICE GINSBURG When? TOR ECKLUND We moved in the same . . . when we opposed the motion, and it was denied by the District Court in the order with prejudice. JUSTICE GINSBURG But the discovery, or whatever had been conducted at that point, was based on, or the motion was based on, what you had alleged, correct? TOR ECKLUND Well, there was no discovery. It was a 12B6 motion. JUSTICE GINSBURG I understand that. TOR ECKLUND Right, so . . . JUSTICE GINSBURG That's why I said, when you moved. JUSTICE GINSBURG And it's . . . so, when you say you moved to amend the complaint, where is that in your papers? Because I thought you only opposed, you only argued in opposition that they weren't, and you can't amend your complaint in an opposition . . . TOR ECKLUND We moved in the same time, and if you look at the District Court's order, the last thing it does in the District Court's order is deny our leave to amend with prejudice, and that's one of the things we're appealing up here as well. JUSTICE GINSBURG And the motion to amend moved to . . . the motion to amend was to characterize them as something other than what you had characterized  TOR ECKLUND No, we did not attach an amended complaint. JUSTICE GINSBURG That's the problem, is that who knows what you were planning to characterize them as? TOR ECKLUND But, Your Honor, the ICS is not the only thing that this case turns on. JUSTICE GINSBURG And what's your good faith basis for saying they're not? They have . . . what quality of an interactive entity do they not have? TOR ECKLUND We're following this Court's analysis in LeadClick, which wasn't the holding in LeadClick, but which was dicta in LeadClick, where they suggested that LeadClick was not in ICS because it did not meet the policy behind the CDA. So this Court, it was this Court that suggested that argument to us when we went back and we read LeadClick closely. Most cases don't even argue the ICS, but when we looked at LeadClick, we saw that. We saw this Court saying, you know, the ICS isn't a given. It's something you have to analyze and you have to look at congressional policy. And as we say in our brief, it's a legitimate question whether or not an app, a geolocating app whose primary purpose is sexual liaisons, falls within the CDA's policy. JUSTICE BREYER. Does the CDA app not ultimately rely on a computer server? TOR ECKLUND. I don't know. We haven't had discovery. I think probably yes. JUSTICE BREYER.  Probably yes. But so did . . . JUSTICE BREYER. If you would allege something different, that would presumably have appeared to be implausible, right? You would agree with that? TOR ECKLUND. It could interact peer-to-peer. There may not be servers involved. What's happening a lot here in all these cases is a lot of people are playing computer scientists when the state of the technology has changed so rapidly. We need expert testimony here. We need discovery. We need to see server logs. We need to see what the backside is. At one point, the Court, in its opinion, in a footnote, says CDA immunity is so broad that it applies to software architecture, to network architecture. That's not at all clear to me. I don't understand where the district court . . . JUSTICE BREYER. That's not clear to me either because I haven't thought about it because it's not in this case. What's in this case is whether this particular service is interactive and is based on computer interactivity. And it seems to me that the more you say that it is a dating app that says where you can find people to date, it sounds like an interactive computer service. TOR ECKLUND. Well, first of all, that's one of the issues in this case is whether or not—and this is a novel issue of first impression—of whether or not this is actually a service or if this is a product, because the first three counts that we bring are product liability counts. And courts in this country are trending towards tweeting this kind of software, these kind of applications, which, Your Honor, I would maintain are very different than, say, Matchmaker or Roommates or your standard pull-down websites, because here there's a whole level of functionality where you are tracked in real time on a smartphone. When the CDA was written, smartphones didn't exist. Google didn't exist. Facebook didn't exist. The technology has far outpaced what this law is about. It's directed at passive content on bulletin boards. JUSTICE GINSBURG. May I take you in another direction? TOR ECKLUND. Absolutely. JUSTICE GINSBURG. I understand the harassment your client suffered is obviously disturbing and prompts sympathy, but I want to make sure I understand. If your client had never gone on Grindr but his ex-boyfriend, out of, you know, malice, pique, whatever, had gone on Grindr and falsely represented himself to be your client and falsely given that information, wouldn't the harassment be just what happened now? In short, isn't your client's presence on Grindr for a period of time irrelevant to the harassment he ultimately suffered? TOR ECKLUND. Just some of the claims, but not all of them. And, Your Honor, I'm out of time. JUSTICE SOTOMAYOR. Go ahead. JUSTICE GINSBURG. Please explain to me why the answer to my question is not unequivocally yes. TOR ECKLUND. Because the product's liability claims don't turn on him being a subscriber. JUSTICE GINSBURG. But he would have to have been injured by his own acquisition of the product. And I'm asking you how he, how his acquisition of the product, following your hypothetical that it's a product rather than a service, caused him injury. I would think it's exclusively the malicious conduct of the other person. TOR ECKLUND. Well, I take you back to page 866. And the fact we don't know about is how was he being geolocated at when he was being stalked? Because he was. And that's, that's in the complaint. JUSTICE SOTOMAYOR. He was being stalked at his workplace and his home. TOR ECKLUND. Yes, Your Honor. JUSTICE SOTOMAYOR. That fact was surely known to Gutierrez. So I'm not sure I know what the geolocation would add to it. I mean, Gutierrez said where you can find him. And like most people, he could be found at home. He could be found at work. But it's not as though people were locating him in the subway or, or, or in a restaurant. TOR ECKLUND. Well, those are facts we don't know. What we do know from. JUSTICE SOTOMAYOR. My understanding is that those are the facts. He was being, he was being harassed at home and at work. TOR ECKLUND. He was being stalked 24-7 at points. At one point, six people came within four minutes. He couldn't walk anywhere, anywhere. If you imagine walking out that door right there and having some crackhead behind it. Imagine trying to go to the bathroom. Nobody could stop it. And the only people who could stop it. JUSTICE SOTOMAYOR. The whole thing is horrible. I mean, the question is, what's the responsibility of Grindr? TOR ECKLUND. They have the same duty of care that their competitors. They're not the only ones in this field. When our client went, when this happened with Scruff, one of their competitors, they stopped it within 24 hours. That's the thing. This fix was easy. What's strange about this case. Almost always allow people to identify where someone is precisely located. JUSTICE SOTOMAYOR. No, not necessary. And not like Grindr, which has a history. TOR ECKLUND. Not necessarily, but certainly sometimes. And some of them do. JUSTICE SOTOMAYOR. My Twitter doesn't locate me. You can turn that on if you want to geolocate. TOR ECKLUND. I didn't say all of them. JUSTICE SOTOMAYOR. But this is different because this is actually tracking you and calculating relational distances. It would say, you know, TOR is 10 feet away from Judge Jacobs. And in real time. And what's not clear here is how that actually happened in this case. When he wasn't using the app, were they still harvesting data from his phone? Was it being geo-spoofed? Did they not meet the industry standard of care? JUSTICE BREYER. Would you just help me out? Would you point me to, because I take it that this is all covered by New York law, correct? The product's liability. TOR ECKLUND. Yeah, this is all product's liability. JUSTICE BREYER. Would you point me to a New York case that could helpfully identify this software, this app, however you want to describe it, as a product rather than a service? TOR ECKLUND. I believe we cited a couple in our brief. The restatement, third of tort. JUSTICE BREYER. No, no, no, I'm asking about a New York case. TOR ECKLUND. I would have to refer to my brief. I don't have it off the top of my head. If there were no cases that helpfully identified this as a product rather than something else for purposes of product's liability, what should we do? JUSTICE BREYER. You should remand to the district court so these important decisions aren't made on a threadbare factual record. We're not asking for these decisions to be made right now, these substantive ones. We're saying that a CDA defense is an affirmative defense and this case is a prime example of why it's normally an affirmative defense. This Court was right to dismiss in Ricci because that was a straight-up case. It was a pro se case. I think two of the judges on this panel were on that case. There was nothing to that case. And I read that case in Ricci, I read that case as the Second Circuit saying we're just joining the other circuits in the standard reading of the CDA, which makes sense. But LeadClick, this Court, pioneers a little bit and it just doesn't take for granted that a CDA defense, and it's looking at things from a consumer protection viewpoint, a consumer safety viewpoint, which ultimately is what this case is about. It's a product's liability case about consumer safety. We will hear your rebuttal and we will hear you then, sir. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Daniel Waxman from Bryan Cave Leighton-Paysner on behalf of Grinder LLC and Kale Grinder Holdings, Inc. Counsel, it is just simply incorrect. This is a very straightforward CDA case and Judge Caproni rightly found it so. There is no reason to argue that Grinder is not an ICS. As this Court recognized in Ricci, the definition of an ICS has been construed broadly to effectuate the statute. You would agree that we've never specifically had to deal with an app that is without reference to a separate computer server, at least not on the surface? I would agree with that, Your Honor, but there is no functional distinction between the Grinder app and all the other ICSs that have been found to be ICSs under the CDA, including Facebook, Instagram, Twitter, roommates.com, matchmaker.com, and recently the Southern District Court in Franklin v. Exgear found an app, Instagram, to be an ICS because the touchstone is that provides subscribers with access to a common server, which apps and websites both do. There is no difference. And the definition of an ICS under the CDA doesn't say it has to be a website. Rather, it says any information service system or access software provider that provides or enables computer access by multiple users to a computer server. That's exactly what Grinder does. People are allowed to connect on Grinder from all different places on a single server, and that's how they communicate. There's no difference between that and Facebook and Twitter and Instagram. What about the issue of whether your client could be targeted under a geolocation feature even after he no longer was subscribing to the service? Your Honor, it's just an impossibility. What the geolocation feature does is very simple. It allows someone to open up the app, and then there will be a cascade of users, and it will show you who is nearest you. And then if you click on that profile, it will show you the distance in terms of feet and miles. That's it. But again, someone has to open the app and be a subscriber for Grinder to have access. How did that happen in this case? What's your view of how it happened? Your Honor, we don't even have to ask what my view is because plaintiff has expressed exactly what happened. What the ex-boyfriend did was he created these harassing impersonating profiles, and then through direct messaging, he arranged sex dates. That's what they say repeatedly in their complaint. How was it able to know that the plaintiff was at a particular location at a particular time when the app that was open was the boyfriend's? Because the ex-boyfriend, in his effort to harass him, gave the precise location of Mr. Herrick. He knew that 24-7? He knew where the plaintiff was? Well, he sent them to two possible locations, his residence and work. It's possible they showed up when he wasn't at one of those two locations, but all we know is that he showed up, that those suitors, those prospective suitors showed up because J.C., the ex-boyfriend, engaged in chat with him and put it on his profile. There is no way that the geolocation feature has anything to do with this case. Let's take this hypothetical. What if, hypothetically, and I understand that you would dispute this as a matter of fact, but what if there were a software vulnerability in the app that allowed a stalker like J.C., like the ex-boyfriend, to use Grindr's geolocation ability to do what he did? To engage in the sort of really despicable acts that he did. Would Grindr then be entitled to the immunity protections under the CDA of 230? I would say absolutely, Your Honor. How is that possible? The geolocation feature is a neutral assistance. It's open to both good users and bad users. And if someone . . . Well, what if Grindr was aware of this particular vulnerability? If Grindr was aware of a vulnerability that allowed a bad user to misuse the geolocation, I mean, it is a hypothetical, but I would, in that situation, I would say it still would not be liable under the CDA. There is a Ninth Circuit case that is not a remote analog of what Judge Lawyer is asking about. Which case is that, Your Honor? That's the one involving the service that showed photographs of models. Right, but, Your Honor, you're talking about the internet brands, which was dope. In that case, all the activity took place outside of the website. There was nothing posted on the website. There was no user content. And that's why the CDA didn't apply. Here, every claim begins and ends with user-generated content, which is the impersonating profiles posted and created by J.C., his ex-boyfriend. Well, let me suggest that the hypothetical might indicate otherwise to the extent that the boyfriend puts on that he is the plaintiff and communicating what his desires are. But the disclosure of where the plaintiff actually is in Judge Lawyer's hypothetical is coming from your app and a possible defect in it. And to that extent, you are the publisher of the location information. That's what the hypothetical is asking you to consider. So tell us why we shouldn't be concerned with that. Your Honors, what I would say is that under Iqbal and Twombly, it has to be a plausible allegation. I mean, you can make up any fantastical allegation of what the geolocation feature does, but we know that's not what happened. If Mr. Herrick didn't have the app open, there's no way we could track him. You're fighting the hypothetical. Right, I'm fighting— Stop fighting the hypothetical. Okay, sorry. If there was a flaw in the geolocation feature and Grindr was aware of it and it allowed people to somehow magically show up at where the app—no one even had the app. I can't even understand how that hypothetical is possible. I would say, you know, potentially we would still have a CDA argument because the bulk of the—the bulk of the claim is based on user-generated content. I would say we'd still feel within all three of the prongs because you're taking a neutral assistance with the geolocation. Someone has to spoof it or do something to weaponize it. It's just not happening on its own. I think that the argument of plaintiff—and he can obviously speak for himself in rebuttal—is that that position that you've taken is one where we're relying on your word, that they want discovery on how the technology actually works. Presumably, they would then have an expert who would say, well, the hypothetical Judge Loyer posited is possible and this is how a flaw could exist in it and that then you're off to the races. Why don't you want us to go that route? Well, Your Honor, the plaintiff has repeatedly admitted in his complaint that that's not how this happened. He says that the ex-lover created profiles and then engaged in chat with him to tell him where he was and arranged sex dates. They knew very detailed information about him. They knew his name, his location, his personal characteristics, a false portrayal of him as HIV-positive. I think that that actually refers to—and whether this is plausible or not is a separate question—but it refers to Grindr doing many of the things that you're now saying they claim the ex-boyfriend did. Right. Grindr doesn't do anything. It doesn't engage in chat with people. It allows people to chat with each other. So Grindr did not create any of this content. I mean, there's no argument that Grindr was in cahoots with the ex-boyfriend to try to create the impersonating profiles. This is all done— You're making—your entire argument so far is that this is magical and implausible. I would say that's correct, Your Honor. Except only on this new theory, which was post-complaint, that the geolocation feature had anything to do with this harassment. Because at the temporary restraining order hearing before Judge Caproni and in the complaint, they explained exactly how this harassment happened, which is that the ex-boyfriend, in an effort to harass his former boyfriend, created these fake profiles and engaged in chat on the app. Was it your position that the fake boyfriend would have had to have said in the chat, I am at location, and then having given that information that then how your app worked was on the other person who was looking for him, and it would say he's 144 feet away or he's a mile and a half away, that that's how the geopositioning worked because the boyfriend had disclosed the location? I don't think the geolocation feature had anything to do with this harassment, Your Honor. I think if the ex-boyfriend wants to tell people to go to visit on a— But counsel says the harassers, the people who thought they were responding to a bona fide ad or communication, that they were getting information on how far away the communicant was. Is that not right? No, it's not right, Your Honor. They were getting information from where he was because— Where he was, but not how far away he was? That's right. They were getting—it stands to reason, Your Honor, that if you have a bad actor who's trying to send someone to somebody, he's not going to say, you know what, rely on the geolocation feature. It's going to tell you that I'm about 78 feet away, and you decide which direction. They're going to give the address. No, but I've never used locations where you look and you know you're going to the Empire State Building. I mean, but your feature nevertheless says, you know, 400 yards away, 150 yards away, you have arrived. I mean, they're saying, as I understood it, they're saying that's what happened for the recipients of the boyfriend's false information. Your Honor, as I understand it, that they repeated in the complaint and at the hearing before Judge Caproni is that the way that these individuals had his location was because he gave it to them. Through direct messaging. Through direct messaging, which— Wouldn't the—if the app was functioning the way that you were describing it, then presumably there would be a geolocation feature that would be telling people where the boyfriend, Gutierrez, is located rather than where his victim is located. Precisely, Your Honor, and there's no allegation that J.C. was standing in the apartment or his workplace next to him when this happened. So the geolocation feature, again, as I submit, had nothing to do with harassment. Can it be turned off? It can be turned off, yes. Thank you. Okay. Thank you, Your Honor. Good morning, Your Honors. Moez Caba of Houston Hennigan on behalf of Grinder Holding Companies. May it please the Court. I want to touch on two quick issues on the CDA and then address the rest of the arguments, if I may, Your Honor. Just with respect to questions that have been asked, the issue of the ICS, whether or not Grinder is an ICS, as the Court has acknowledged, plaintiff claimed it was in the complaint. Plaintiff made a similar admission at the TRO hearing before the district court judge. The Court asked, are you not disputing that it's an ICS? And he said, no, no, Your Honor, what we're saying is this other thing as well. You would agree that we've never explicitly or directly dealt with an app standing alone rather than a website in connection with determining what constitutes an ICS? Well, this Court specifically has not said an app is — well, Your Honor, the Court has not said that, yes, an app is an ICS as opposed to a website, but the Court has not said that an app is not an ICS. Well, I understand that. There hasn't been a distinction, Your Honor, and the framework that, Your Honor, this Court has set up make quite clear that an app would qualify as an ICS because the definition of an ICS does not require it to be a website. The other point I would make on this CDA argument is the Court asked, well, how do you know it's a product or a service? And certainly, plaintiff has made allegations in the complaint that it was a product, but plaintiff also tellingly describes it as a service in his complaint — in the amended complaint paragraph 66. I think it's a very telling paragraph. Plaintiff says, grinder knowingly and negligently allows its service to be used as a weapon of hostility and violence. It allows its platform to be used to pick fights in plaintiff's names with other grinder users and allows plaintiff to be portrayed as racist. The appellant is revealing that this is, in fact, a service. This is, in fact, being used by a third party. And grinder's role in here is as a platform, as a service, that is allowing what is — everyone agrees is terrible, offensive behavior. It can plead in the alternative. It can plead that it's a product and or a service. But insofar as he is pleading it is a service, he is clearly putting himself smack in the middle of the CDA protection — immunity that is granted to grinder. If I may, Your Honor, I'd like to also turn to the fraudulent, negligent representation claims briefly. On those, the district court analyzed a number of elements which run across the claims. One of them is there is no misstatement of material fact here. There's no statement at all? There's no statement at all. And insofar as plaintiff is relying on the terms of service to claim there is a statement, that was something the appellant agreed to in 2011 and then withdrew from the app and is now making claims of conduct that happened in 2016, a year after plaintiff claims he was no longer using the app. Similarly, there could be no reasonable reliance on a statement that does not exist. And insofar as there was a statement in the terms of service, they expressly disavow any obligation on the part of the app to monitor user content, to address user content, etc. And then, of course, there is the fundamental problem that, as the court was alluding to earlier, the cause, the proximate cause of the harm here is not the app or any statement made by the company or by grinder. The proximate cause of the harm is the conduct of this third party, the ex-boyfriend. That runs across the fraud, the negligent misrepresentation, the promissory estoppel claims, and the GBL claims except reasonable reliance is not an element of both of the GBL claims. The final point I'd like to make in the last minute is with respect to the members of Grindr, which have also been named in the litigation, there are two companies at the time that were members of Grindr, KL, Grindr Holdings, and Grindr Holding Company. There's three problems with leaving them in the lawsuit. One, there is a personal jurisdiction defect. Plaintiff doesn't even claim that they have the evidence to make the initial showing that there is personal jurisdiction. They simply say, well, we should be entitled to jurisdictional discovery. This court held in Best Van Lines v Walker that you're not entitled to jurisdictional discovery when you have failed to establish even the necessary predicate elements of personal jurisdiction, and those allegations do not exist. The second point is a member cannot be held liable for its investment company's acts under California law. My client, Grindr Holding Company, that California law governs here with respect to- Can I go back to the initial issue that you raised? Sure. So, and I mentioned this to your colleague, one of the allegations is that there was a security vulnerability that permits a third party to see a user's exact location. Right? And if that includes a, or included a former user's exact location, wouldn't that be a problem for you and for Grindr? If, in fact, there is a security violation, but if that issue is being used by a third party to engage in improper conduct, that would still satisfy the three elements that would establish CDA liability. That is not the case we have here. We do not have a case where they're saying there's some other sort of conduct that gives rise to liability in and of what Grindr is. The entirety of this claim is, I think, evidenced by the paragraph that I was citing. Conduct is not plugging, so to speak, that vulnerability. It's not necessarily the content. It is now one way to look at it. Well, the only reason that even that alleged security vulnerability, which, of course, it is implausible. But even if, going with the hypothetical, the only reason that would even be a problem is because of the content of messages sent by a third party. Right? It is that third party posting the image. That third party- Let's go back to Ricci. We said it's a very broad immunity and so on, but you're now relying on the breadth of the immunity. Well, I'm really just relying on the elements, Your Honor. A security vulnerability, even if one exists, does not in and of itself create a cause of action. It's when that ex-boyfriend puts up the photo. It's when that ex-boyfriend directs folks to the appellant's address. It's when that ex-boyfriend- My question is, we've also referred to neutral tools as a part of the framework. How is a security vulnerability a neutral tool? Well, it's neutral in so far as it can be used for good or evil, so to speak. It does not, that it is described or characterizes security vulnerability, which the district court did not credit. But that it is described as such does not make it no longer a tool of neutral assistance. Thank you. Thank you. We'll hear from him. I think the court can see how difficult the questions are in this case, how complex they are, and the need for this case to be remanded so we can have expert testimony from both sides, from computer scientists, so that we can see the server locks, so we can see how the Grindr patented geolocation actually works because- I would say that there is a security vulnerability of the sort that I gather you allege. So what? I mean, as a matter of whether or not Grindr is entitled to the immunity under the CDA under 230, it seems to me that someone used that security vulnerability to provide content about the geolocation device of your client, or the location of your client. Well, there's a few things in that, but I'll go with the security flaw. For instance, if that security flaw was known to the community, it had been posted, say, on GitHub or somewhere, then we say products liability law comes in, ordinary negligence comes in. Why is it- it's information. It's not just information. Which can be useful or which can be harmful. It's not just information. It's the design and operation of a product in the stream of content. Which ultimately yields information. Not just that, because this is a 21st century products liability case, and what's different here than anything else in our history is that the manufacturer of the product still has exclusive control over it while it's in the stream of commerce. In other words, they can turn this whole system off. If Grindr had wanted to, they could have stopped the geostocking of our client by turning the whole system off. Their competitors dealt with this in 24 hours. When you say the whole system, you mean shut down the app? No, they have exclusive control of it. Or they could- Let me ask you this. You know, you have an obligation to plead a plausible claim. Do you have any basis for thinking that it is possible once an app- once a person unsubscribes from an app, for that app to track him geographically? Absolutely. Google did it. What is the basis for that? Google did it with their location services, and they told people that if you turn off your location tracking on your smartphone, we will no longer track you. Google tracked people after they opted out. This company, Grindr- They opted out of a tracking service. Your client app opted out of the whole app. And I'm asking whether you have spoken to computer people and have a basis for thinking that once your client was off this app, it was nevertheless possible to track him. It's entirely plausible. First, we don't know from the record whether or not he deleted the app from his phone. This company, Grindr- You're- you're- this is the plaintiff. If we don't know about it, we would assume adversely to him. This is a fact known to him. We could go and amend the complaint, Your Honor, but what- if you do look at A66 to corre- I'm sorry. Did he delete the app or not? I don't know that answer, and I know that when he- when the stalking happened and he wasn't getting any response, he had to download the app again to see what was going on with his own profiles. So there's a whole fact pattern here, because unlike most of the cases that deal with anything similar to this, which there really aren't, this occurred over the course of a year, not like a week, not a few days. And unlike all the other cases where people responded, Grindr really didn't respond. And I'd like just to correct real quickly something Mr. Waxman said. On page A66 of the joint appendix, which is our amended complaint, you will see Mr. Herrick's geolocation relationally calculated to the person that that phone is screenshotted of, 104 feet. Now, it's possible that JC was geospoofing, which brings up the software flaw, because geospoofing is well known, you can buy geospoofing apps on the app store. But there's too many unanswered questions in this case. It's not reachy. It's not appropriate for dismissal on a 12B6. That's the one that says 104 feet away? Yes, Your Honor. And if you also look there, you'll see a targeted ad from Hotels Tonight on the bottom of some of those screenshots, which brings you back to the back end of this system being a targeting system. What if any criminal action was taken against the third party? Your Honor, I'm out of time. May I answer that question? They are currently detained, awaiting trial. I believe they've been detained since October 12th, 2017, and I don't know if it's gone to indictment. And did that reveal any public information that you could use about how they did it? Not that I'm aware of, Your Honor. Thank you. Thank you, Your Honor. All will reserve decision.